IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| AND | ) |
| | ) |
| THE STATE OF INDIANA, | ) |
| | ) |
| PLAINTIFFS, | ) |
| | ) |
| v. | ) Civ. Action No.: 1:10-cv-0935-LJM-TAB |
| | ) |
| HOOSIER ENERGY RURAL | ) |
| ELECTRIC COOPERATIVE, INC. | ) |
| | ) |
| Defendant. | ) |
| | ) |
| _____ | ) |

MEMORANDUM IN SUPPORT OF UNITED STATES' MOTION TO ENTER CONSENT
DECREE

        The United States of America, on behalf of the United States Environmental Protection

Agency ("EPA"), respectfully submits this memorandum in support of its motion seeking entry

of the proposed Consent Decree as an order of this Court.[1]   The Court's entry of the Consent

Decree will resolve all the claims brought by Plaintiff the United States and Plaintiff the State of

Indiana, against the Defendant, Hoosier Energy Rural Electric Cooperative, Inc. ("Hoosier"), in

this Clean Air Act ("CAA" or " the Act") enforcement case.

_____

[1] The Decree is attached as an exhibit to the United States' July 23, 2010 Notice of Lodging of
Proposed Consent Decree, identified as Docket Entry No. 4-1, as corrected by this Court's
August 2, 2010 Order.  *See* Docket Entry No. 7.   An extra copy of the Decree is attached as
Exhibit 1 to this memorandum.

The complaint in this action alleges violations of the Prevention of Significant Deterioration ("PSD") provisions of the Act, 42 U.S.C. §§ 7470-7492, Title V of the Act, 42 U.S.C. §§ 7661-7661f, and the Indiana State Implementation Plan ("SIP"). These provisions prohibit owners and operators of large air pollutant emission sources (such as coal-fired electric generating units) from making certain kinds of modifications to those sources, without also obtaining a permit and installing the "best available" pollution control technology (referred to as BACT) on those sources. Such controls dramatically reduce emission of pollutants from such sources.

The sources of pollution at issue here are Hoosier's two coal-fired electricity generating plants, the Merom Generating Station, a two-unit, 1,094 megawatt plant located in Sullivan County, Indiana, and the Ratts Generating Station, a two-unit, 264 megawatt plant located in Pike County, Indiana. Those plants burn thousands of tons of coal in generating millions of kilowatts of electricity. In doing so, the plants also create and emit into the air thousands of tons of pollutants each year, including sulfur dioxide ("$SO_2$"), nitrogen oxide ("$NO_x$"), and particulate matter ("PM"), which are known to be harmful to human health and the environment. In addition, the Merom Station emits significant quantities of sulfuric acid mist ("$H_2SO_4$"), another harmful pollutant.

The Consent Decree should be entered because it is fair, adequate, reasonable, in the public interest, and consistent with the goals of the Act. The settlement will significantly reduce $SO_2$, $NO_x$, and PM emissions from the Merom and Ratts plants, and $H_2SO_4$ from the Merom plant. The Consent Decree also requires the Defendant to pay a $950,000 civil penalty and to spend $5 million on environmental mitigation projects. The Consent Decree resulted from

extensive arm's-length negotiations between the Plaintiffs – the United States and the State of Indiana – and Hoosier.  The parties reached this agreement after careful and informed assessment of the merits, costs, risks, and delays that further litigation would entail, as well as the benefits of settlement including the reduction of risk to human health and the environment.

All parties have signed the Consent Decree.  The Defendant consented to entry of the settlement without condition and waived its right to oppose entry or challenge any provision of the Consent Decree.  *See* Consent Decree ¶¶ 1, 230.  The United States conditioned its final approval of the Consent Decree to allow the public an opportunity to review and provide comment to the United States regarding the settlement embodied in the proposed Consent Decree.  *Id.* ¶ 230.

Pursuant to 28 C.F.R. § 50.7, notice of lodging of the proposed Consent Decree with the Court was published in the *Federal Register* on August 6, 2010.  *See* 75 Fed. Reg. 47,627 (Aug. 6, 2010).  The notice specified where to locate a copy of the proposed Consent Decree and the manner and time period in which the public should provide comment to the United States regarding the settlement.  *Id.*  The United States received one set of comments on the proposed Decree, submitted on behalf of a number of individuals who live near the Merom plant.  Those comments, a complete copy of which is attached hereto as Exhibit 2, express support for entry of the Consent Decree, and also request that the United States take additional measures to address other pollution from the Merom plant.

In light of all of these considerations, and after considering the public comments received in support of entry of the Decree, the United States respectfully requests that the Court approve and enter the Consent Decree, and thereby resolve this case.

## BACKGROUND

A.     Hoosier Energy

Hoosier is a non-profit generation and transmission cooperative providing electric power to 17 member-owner electric distribution cooperatives in central and southern Indiana and one member cooperative in Illinois.  The total generating capacity of Hoosier's coal-fired system is 1,358 megawatts, which comes from the Merom plant, comprised of two 547 megawatt generating units designated as Merom Unit 1 and Merom Unit 2, and the Ratts plant, comprised of two 132 megawatt generating units designated as Ratts Unit 1 and Ratts Unit 2.  Hoosier also owns and operates other electric generation facilities, including natural gas units and a renewable energy landfill methane gas facility.  Hoosier and its distribution cooperatives serve nearly 800,000 residents, businesses, industries, and farms, though the majority of Hoosier's customers are residential.

B.     Applicable Clean Air Act Requirements

The CAA, 42 U.S.C. § 7401 *et seq.*, was enacted "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population."  42 U.S.C. § 7401(b)(1).  In 1977, Congress amended the CAA by establishing the New Source Review ("NSR") program, which addresses the impact on ambient air quality resulting from newly constructed or modified pollutant-emitting facilities.  The NSR program itself consists of two programs:  the PSD program, which applies in areas that satisfy national ambient air quality standards set by EPA, 42 U.S.C. §§ 7470-7479, and the Nonattainment NSR (NNSR) program for areas that violate air quality standards, 42 U.S.C. §§ 7501-7515.  *See also Citizens Against Ruining the Env't v. EPA*, 535 F.3d 670, 673 (7th Cir.

2008).  The PSD program is applicable to this case because, at all times relevant to this action, the Merom and Ratts plants were located in attainment areas for the relevant pollutants.

Under the PSD program, "[n]o major emitting facility . . . may be constructed" or modified without first meeting several requirements.  42 U.S.C. § 7475(a); *see* 42 U.S.C. § 7479(2)(C).  Among those requirements, a facility must obtain a permit setting forth emission limitations and must be subject to the best available control technology, or BACT, for each pollutant subject to regulation.  *Id.* § 7475(a)(1), (4).  The Act defines the term "construction" to include a "modification," 42 U.S.C. § 7479(2)(C), which in turn means "any physical change in, or change in the method of operation of, a stationary source which increases the amount of any air pollutant emitted by such source or which results in the emission of any air pollutant not previously emitted."  42 U.S.C. § 7411(a)(4).

The Act requires each state to have a State Implementation Plan ("SIP") to meet PSD and other CAA requirements, and EPA has promulgated regulations that establish minimum standards for the approval of such plans.  40 C.F.R. § 51.166.  The applicable PSD regulations, which are found in the Indiana SIP and codified at Title 326 IAC Article 2, Rule 2, define "major modification" to include "any physical change in, or change in the method of operation of, a major stationary source that would result in a significant emissions increase and a significant net emissions increase."  "Significant" means a rate of emissions that would equal or exceed any of the following rates for the following pollutants: $NO_x$, 40 tons per year; $SO_2$, 40 tons per year; PM, 25 tons per year; and fine PM ("$PM_{10}$"), 15 tons per year.

In addition to the PSD permitting requirements, the Clean Air Act and its implementing regulations also require sources like the Merom and Ratts plants to obtain additional operating

permits under Title V of the Act, 42 U.S.C. §§ 7661-7661f.  These permits must identify all requirements (including PSD requirements) applicable to a source.

<u>VIOLATIONS ALLEGED IN THE COMPLAINT</u>

The Complaint in this action was brought against Hoosier pursuant to Sections 113(b) and 167 of the CAA, 42 U.S.C. §§ 7413(b) and 7477, as well as state and federal regulations promulgated in furtherance of those provisions of the Act, for injunctive relief and civil penalties.  Specifically, the United States and the State of Indiana allege that Hoosier modified Merom Units 1 and 2 under the PSD program, and that Hoosier thereafter operated the Units, as modified, without complying with PSD requirements, and without subsequently obtaining a Title V permit incorporating those requirements.  The alleged modifications include: (1) replacement of the high temperature superheater outlet header, radiant superheater, and high temperature superheater at Merom Unit 1 in 2008, and (2) replacement of the high temperature superheater outlet header, radiant superheater, and high temperature superheater at Merom Unit 2 in 2009. The Complaint alleges these projects resulted in unpermitted emission increases of $NO_x$, $SO_2$, PM, and/or $PM_{10}$, thus triggering the CAA's PSD provisions and applicable provisions of the Indiana SIP, which would have required Hoosier to install or upgrade pollution controls to reduce emissions.  Compl., ¶¶34-38.  The Complaint further alleges that following the illegal modifications, the Defendant failed to comply with its obligations under the operating permit provisions of Title V of the Act.  Compl., ¶¶ 39-42 (alleging that the Defendant failed to identify all applicable requirements, accurately certify compliance with such requirements, and submit a compliance plan for all applicable requirements, and thereafter operated without a valid Title V permit).

6

Hoosier denies the violations alleged in the Complaint by the Plaintiffs.  Nonetheless, in light of these alleged violations, Hoosier, the United States, and the State of Indiana entered into long and hard-negotiated settlement talks to try to resolve these claims.  The proposed Decree is that settlement.

<u>SUMMARY OF CONSENT DECREE PROVISIONS</u>

As summarized below, through the installation and operation of pollution control devices and imposition of stringent pollution limits, the Consent Decree will secure major reductions in $NO_x$, $SO_2$, PM, and $H_2SO_4$ emissions and yield substantial benefits to the environment.

A.    <u>$NO_x$ Controls</u>

In 2004, the Defendant installed pollution control devices at the Merom plant known as selective catalytic reduction devices ("SCRs") which, when operated, reduce $NO_x$ emissions.  To further control $NO_x$ emissions, the Decree requires Hoosier to upgrade the performance of these SCRs to meet a well-controlled emission rate that becomes increasingly more stringent, declining to 0.080 pounds per million BTU (lb/mmBTU) by December 2012 for one unit, and December 2013 for the other unit.  Decree ¶¶ 69-70.  In addition, Hoosier must continuously operate the SCRs at all times that the Merom units are operating.  Decree ¶ 68.  At the Ratts station, the Decree requires Hoosier to install and continuously operate new selective non-catalytic reduction ("SNCR") technology on both units.  The SNCRs will be operational by the end of 2011, and must continuously meet unit-specific emission rates that decline over time, culminating in a final emission rate of 0.230 lb/mmBTU by the end of 2014.  *See* ¶¶ 65-67.

In addition to these plant-specific emission limitations, the Decree also imposes declining annual systemwide tonnage limitations on Hoosier's total $NO_x$ emissions.  Through these caps,

Hoosier's overall emissions will be driven downward through 2015, and will be held to 2015 levels thereafter.  From 2011 through 2012, Hoosier's systemwide annual $NO_x$ emissions cannot exceed 5,869 tons.  By 2015, and continuing thereafter, Hoosier's systemwide annual $NO_x$ emissions cannot exceed 4,800 tons.  Decree ¶¶ 71-73.  Compared to systemwide $NO_x$ emissions in 2009 (6,645 tons), the final systemwide tonnage limitation secures a reduction of 1,845 tons.  Furthermore, as with other settlements the United States has entered into to resolve PSD violations at electric utility plants, the Decree also restricts Hoosier's ability to sell or trade any excess $NO_x$ emission "allowances" secured by virtue of the Decree-mandated reductions, unless such allowances become available as the result of Hoosier's ability to achieve greater reductions than those required under the settlement.  Decree ¶¶ 76-77.

B.    $SO_2$ Controls

Both of the Merom units have existing flue gas desulfurization ("FGD") devices for controlling $SO_2$ emissions.  However, those devices do not currently perform at the high level of removal efficiency achieved by modern FGDs.  The Decree requires Hoosier to significantly upgrade these existing FGDs to meet unit-specific emission limitations that become increasingly more stringent.  Hoosier must complete the upgrades for one unit by June 2012 and the other unit by June 2013, and beginning three to six months thereafter (depending on the unit), either meet a well-controlled emission rate of 0.150 lb/mmBTU or a removal efficiency of 95%.  Decree ¶¶ 91-92.  By December 31, 2014 for one unit, and December 31, 2015 for the other unit, the removal efficiency ratchets up to 96%, unless Hoosier is able to demonstrate to EPA that 96% is infeasible.  *Id.* ¶¶ 91-93.  In addition, Hoosier must immediately optimize the operation of its existing FGDs and continuously operate them at all times that the units are operating.  *Id.* ¶ 90.

At the Ratts station, the Decree requires Hoosier to meet a declining Ratts plant-wide annual $SO_2$ tonnage cap which will significantly reduce emissions from the plant from current levels.  *Id.* ¶¶ 83, 86-89.  The Decree also requires Hoosier to limit the sulfur content of coal it burns during summer months.  *Id.* ¶¶ 84-85.

In addition to these plant-specific emission limitations, the Decree also imposes declining annual systemwide tonnage limitations on Hoosier's total $SO_2$ emissions.  By 2016, and continuing each year thereafter, Hoosier's systemwide $SO_2$ emissions cannot exceed 18,750 tons (further declining to 15,500 tons if Hoosier retires or repowers one of the Ratts units), as compared to 2009 emissions of approximately 38,500 tons.  *Id.* ¶¶ 94-99.  As with the $NO_x$ tonnage cap, these reductions are guaranteed regardless of changes in fuel type or cost, and even in the face of increased demand for electricity.  Finally, the Decree requires Hoosier to annually surrender all excess $SO_2$ emission "allowances" that become available by virtue of compliance with the settlement.  *Id.* ¶¶ 102-103.

C.    H$_2$SO$_4$ Controls

As part of its investigation that lead to the filing of this case, EPA determined that excess amounts of sulfuric acid were being formed and emitted from Merom Units 1 and 2 due to coal combustion conditions at those units.  Such emissions often manifest as a "blue plume" that descends from the stack of a coal-fired unit.  Similar concerns were noted in the comments supporting the Decree, which noted that citizens living near Merom "have had concerns about the emissions of sulfuric acid mist from the smokestacks, which [citizens] have described as a 'blue plume'".  Ex. 2, at 2.   To control sulfuric acid mist, Hoosier must install and continuously operate a reagent injection system at the Merom Station by June 1, 2011.  Decree ¶ 109.  By June

9

1, 2012 for one of the Merom units and June 1, 2013 for the other Merom unit, Hoosier must

achieve and maintain an $H_2SO_4$ emission rate of 0.007 lb/mmBTU, though Hoosier may petition

for a higher emission rate, not to exceed 0.009 lb/mmBTU, if it demonstrates that 0.007 is

infeasible after a "demonstration" period. *Id.* ¶¶ 110-114.  Installation of the Decree-mandated

reagent injection system will drastically reduce sulfuric acid mist at the Merom plant, and

thereby reduce or eliminate the risk of blue plumes.  EPA is not aware of excess sulfuric acid

mist formation issues at Ratts Units 1 or 2, and therefore the Decree does not mandate such

controls at Ratts.

       D.     <u>PM Controls</u>

      The Decree requires Hoosier to optimize its existing PM controls.  Decree ¶119.  In

addition, between June 2012 and December 2015, all four of the Hoosier units will be subject to

an emission limitation of at least 0.030 lb/mmBTU.  <u>Id.</u> ¶¶ 120-121.  The Decree also requires

Hoosier to install and operate two PM continuous emissions monitoring systems ("CEMS") at

Merom.  *Id.* ¶ 125.

       E.     <u>Environmental Mitigation Projects and Civil Penalty</u>

      In cooperation with the Plaintiffs, Section IX of the Decree requires Hoosier to undertake

and pay for a series of environmental projects, which will help mitigate the harm caused by

Hoosier's historical emissions.  These projects include $200,000 for the U.S. Forest Service to

address the alleged damage done to downwind National Forests, and $4,800,000 for a menu of

one or more additional projects ranging from generating electricity from coal bed methane

emissions, retrofitting existing diesel engines with new emissions control technology, replacing

or retrofitting high-emitting wood stoves with new, low emitting wood stoves, or installing new

solar energy technologies (see Decree Appendix A for a full list of projects and descriptions).

Hoosier will also pay a $950,000 civil penalty, with $850,000 paid to the United States Treasury

and $100,000 to the State of Indiana.  Decree ¶ 143.

       F.    <u>Resolution of Claims</u>

Section XI of the Decree resolves Hoosier's civil liability for the various claims alleged

in the Complaint and any other past violations of PSD and Title V requirements arising from past

modifications at the Units covered by the Decree (Merom Unit 1, Meron Unit 2, Ratts Unit 1,

and Ratts Unit 2) prior to the date of lodging of the Decree.

In addition, Section XI of the Decree provides a conditional resolution of future NSR

claims involving increases of regulated pollutants (except $H_2SO_4$ at Ratts and carbon dioxide at

Ratts or Merom) that could arise from "modifications" and which would otherwise be actionable

under the NSR provisions of the Act.  Under these provisions, Hoosier will be protected –

subject to defined "reopener" conditions described below – against future NSR claims at Merom

and Ratts that arise prior to December 31, 2015 (If Hoosier elects to retire or repower a Ratts

unit, the future covenant for that unit only will extend through 2016).  Decree ¶ 148.

This resolution of future NSR claims contains three important conditions designed to

safeguard the public and the environment against the possibility of certain increases in emissions

caused by covered future modifications (Decree ¶¶ 148-152).  First, the future covenant applies

only if Hoosier is complying with the emission reduction requirements of the Consent Decree.

*Id.* at ¶150.  Second, while total tons emitted from the covered units will be decreasing due to the

installation of controls, modifications that increase the hourly rate of emissions by more than a

specified amount will not be protected by the future resolution.  *Id.* at ¶¶ 151-152.  Third, there

are strict limits on the application of the future covenant to units that do not receive state-of-the-art pollution controls.  Specifically, the future covenant does not apply to these units if:

1.    the environment suffers – emissions from a unit are causing or contributing to (a) an imminent and substantial endangerment, (b)  an exceedance of a national ambient air quality standard, (c)  the consumption of a PSD increment, or (d) an adverse effect on a Class I area (such as a national park);

2.    a modification (or group of modifications) to a unit increases the hourly emission rate; or

3.    capital expenditures for the modifications exceed $125/KW between entry of the Decree and December 31, 2015.

*Id.* at ¶ 152.

This resolution of potential future claims is consistent with resolutions provided in similar systemwide settlements that the United States has reached with electric utilities for alleged NSR violations, and is justified by the large percentage of the Hoosier system on which pollution controls will be installed and operated, the beneficial environmental impact such controls will produce, the certainty that emission reductions will be realized, and the protections in the Decree against backsliding at units not receiving new controls (including the declining tonnage caps).  And, while the covenant not to sue for future modifications ends on December 31, 2015 (or 2016 for a repowered Ratts Unit), *id.* at ¶ 148, the injunctive requirements of the Decree will continue indefinitely through the required incorporation of the Decree's provisions into applicable Title V or other federally enforceable operating permits or SIP revisions, as described below.

G.     Incorporation Of Terms Into Enforceable Permits

Consistent with the United States' prior NSR settlements, Hoosier must incorporate the

Decree requirements into both (1) a federally enforceable permit or Indiana SIP revision, and

(2) Title V permits for the Merom and Ratts plants.  Consent Decree ¶¶ 198-199.  Pursuant to

Section XXVII of the Decree, Hoosier cannot seek to terminate enforcement under the Consent

Decree until it has obtained the final permits required by Section XVII.

H.     Other Provisions

The remaining provisions of the Decree are also consistent with prior electric utility NSR

settlements.  *See*, *e.g.*, Decree Section XII (Periodic Reporting), Section XIV (Stipulated

Penalties), Section XV (Force Maejeure).

PUBLIC COMMENTS ON THE PROPOSED CONSENT DECREE

After lodging the Consent Decree, the United States published notice in the *Federal*

*Register* and provided an opportunity to comment upon the settlement.  *See* 75 Fed. Reg. 47,627

(Aug. 6, 2010).  The United States received one comment from a group of citizens who live near

the Merom Station.  The citizens expressed support for entry of the Consent Decree, including

the "mitigation measures for sulfuric acid mist emissions" and the installation and operation of

"controls for sulfur dioxide, oxides of nitrogen and particulate matter" which "will improve air

quality where our clients work and live."  Ex. 2 at 2.  The citizens also expressed general support

for the environmental mitigation projects required by the Decree, though they viewed some of

the projects as a "missed opportunity" to provide more direct benefits to the citizens immediately

surrounding the Merom station.  *Id.* at 2-3.  Finally, after concluding that they "support the

adoption of the Consent Decree as written," the citizens requested that the United States also

take additional action outside the context of this enforcement action to reduce and monitor the amount of fugitive dust and "coal combustion residuals" blowing from a coal ash landfill located at the Merom plant.  *Id.* at 3.

ARGUMENT

I.      <u>Standard of Review</u>

Approval of a consent decree is within the informed discretion of the Court.  *See United States v. Akzo Coatings of America, Inc.*, 949 F.2d 1409, 1435 (6th Cir. 1991).  That discretion generally should be exercised in favor of settlement, because "[p]ublic policy strongly favors settlement of disputes without litigation."  *Aro Corp. v. Allied Witan Co.*, 531 F.2d 1368, 1372 (6th Cir. 1976); *Donovan v. Robbins*, 752 F.2d 1170, 1177 (7th Cir. 1984).  The presumption in favor of voluntary settlement "is particularly strong where a consent decree has been negotiated by the Department of Justice on behalf of a federal administrative agency like EPA which enjoys substantial expertise in the environmental field."  *Akzo Coatings*, 949 F.2d at 1436; *see also United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 84 (1st Cir. 1990) (favoritism towards these types of settlements "has particular force where, as here, a government actor committed to the protection of the public interest has pulled the laboring oar in constructing the proposed settlement").

When reviewing a consent decree to determine whether to enter a proposed settlement, a district court decides "whether the decree is 'fair, adequate, and reasonable, as well as consistent with the public interest.'"  *United States v. Lexington-Fayette Urban County Gov't*, 591 F.3d 484, 489 (6th Cir. 2010) (quoting *United States v. County of Muskegon.*, 298 F.2d 569, 580-81 (6th Cir. 2002)); *see United States v. Wisconsin Elec. Power Co.*, 522 F. Supp. 2d 1107, 1111

14

(E.D. Wis. 2007) (entering and approving a systemwide NSR settlement based on similar allegations against an electric utility because the decree secured environmental benefits and was "reasonable, fair, and consistent with the statutory purposes of the Clean Air Act"). Although a consent decree requires court approval, a court should not substitute its judgment for that of the parties. *Akzo Coatings*, 949 F.2d at 1435. Thus, a court may only accept or reject the settlement agreed upon by the parties, and may not modify a consent decree before entry. *Id.*; *United States v. Jones & Laughlin Steel Corp.*, 804 F.2d 348, 351-52 (6th Cir 1986); *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 630 (9th Cir. 1982); *Wisconsin Elec.*, 522 F. Supp. 2d at 1112.

II.     The Consent Decree is Fair

In determining whether a settlement is fair courts consider factors such as the strength of plaintiff's case, the complexity and length of the litigation, the amount of opposition to the settlement, the good faith efforts of the negotiators, the opinions of counsel, and the possible risks involved in the litigation. *See EEOC v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 889 (7th Cir. 1985)*; Akzo Coatings*, 949 F.2d at 1435 (citing *United States v. Hooker Chem. & Plastics Co.*, 607 F. Supp. 1052, 1057 (W.D.N.Y. 1985).

Based on these considerations, the Consent Decree is unquestionably fair. The settlement is the product of numerous arm's-length negotiating sessions between the Plaintiffs and Hoosier. All parties, represented by competent counsel, extensively negotiated the terms of the agreement for close to a year after EPA issued its Notice of Violation in 2009. Compl., ¶ 6. No one has questioned the good faith of these negotiations, and there are no allegations of collusion between the parties. *See Officers for Justice*, 688 F.2d at 625. The State of Indiana joined in the filing of

the Complaint and is a signatory of the Consent Decree, and EPA provided the public at large with an opportunity to comment on the proposed settlement, see 75 Fed. Reg. 47,627.  As noted above, one set of comments was received from a group of citizens who live near the Merom plant.  Those comments specifically "support the adoption of the Consent Decree as written" because of its beneficial impact on air quality in the community, while urging EPA, outside the context of the instant enforcement action, to also address additional concerns raised by the citizens over coal ash blowing from a landfill at the Merom plant.  Ex. 2.  In the United States' judgment, the citizens' additional concerns about the Merom landfill provide no basis for questioning the fairness of the Decree or otherwise rejecting the settlement.  As the citizens recognize, the Decree provides substantial environmental benefits to the local community, and the citizens themselves urge support Entry of the Decree as written.  *Id.* at 3.  Moreover, this PSD case, which deals with alleged generating unit modifications, is not the vehicle to address the citizens' concerns about coal dust and other fugitive emissions from the Merom coal ash landfill (nor do the citizens ask that it be used as such).  Unlike their concerns about modifications that increased sulfuric acid mist from the Merom plant (which are addressed in the Decree), the citizens' landfill concerns as stated in their comments bear little relation to the types of violations identified by EPA and alleged in this PSD enforcement action.

The proposed Consent Decree is also fair because it reflects the parties' careful and informed assessment of the relative merits of each other's claims, while taking into consideration the costs and risks associated with litigation.  In particular, while the United States has extensive authority under the Act and other statutes to seek permanent injunctive relief to rectify and mitigate violations, obtaining injunctive relief in litigation would depend upon both a finding of

liability and a judicial assessment of the degree of necessary relief.  As with any fair settlement, the Consent Decree reflects a measure of compromise.  Both the United States and the Defendant gain the benefit of immediate resolution of the United States' claims, while foregoing the opportunity to seek an unmitigated victory.  *See Hiram Walker*, 768 F.2d at 889.  The Consent Decree obtains for the United States, the State of Indiana, and the public, injunctive relief to achieve the goals of the Act and dramatically reduce air emissions from the entire Hoosier coal-fired system, and all parties benefit from immediate resolution of the litigation.

Fairness may also be considered in light of the effect of the Consent Decree on the public.  *Aro Corp.*, 531 F.2d at 1374.  The Consent Decree protects public health and the environment by securing injunctive relief at all four units of Hoosier's coal-fired generating units.  This injunctive relief, which includes requiring Hoosier to meet stringent emission reduction requirements, and to perform environmental projects as mitigation for the alleged violations, will ensure significant reductions of $SO_2$, $NO_x$, PM and $H_2SO_4$ emissions.  It has been negotiated by the Department of Justice with input from EPA – an agency with technical expertise and a statutory mandate to enforce the Clean Air Act.  *See Akzo Coatings*, 949 F.2d at 1436; *see also United States v. Rohm & Haas Co.*, 721 F. Supp 666, 681 (D. N.J. 1989) (presumption of validity attaches to settlement negotiated by federal agency charged with its enforcement); *SEC v. Randolph*, 736 F.2d 525, 529 (9th Cir. 1984) (court should defer to the agency's decision that consent decree is appropriate and simply ensure that it is fair, adequate and reasonable).

In short, the Consent Decree is fair in light of the complexity of this case, the expense of continuing litigation, the arms-length negotiations that led to the settlement, and the substantial benefit to the public.

III.    The Consent Decree is Adequate and Reasonable

The reasonableness of a consent decree is determined by considering "the nature/extent of hazards; the degree to which the remedy will adequately address the hazards; possible alternatives for remedying hazards; and the extent to which the decree furthers the goals of the statute." *Akzo Coatings*, 949 F.2d at 1436 (citing *United States v. Cannons Eng'g Corp.*, 720 F.Supp. 1027, 1038 (D.Mass 1989)); *Wisconsin Elec.*, 522 F. Supp. 2d at 1118.  One of the more important factors "when evaluating whether a proposed consent decree is reasonable is 'the decree's likely effectiveness as a vehicle for cleansing' the environment." *Lexington-Fayette Urban County Govn't*, 591 F.3d at 489 (quoting *Akzo Coatings*, 949 F.2d at 1437).

The Consent Decree is reasonable because it satisfies the goal of providing an effective vehicle for addressing the harm to the environment from the alleged violations.  When emitted into the atmosphere due to the combustion of coal, $SO_2$ and $NO_x$ react with water and other substances to form various acidic compounds, $PM_{10}$, and ozone.  Such compounds cause significant harm to human health and the environment.  *See, e.g., United States v. Cinergy Corp.*, 618 F. Supp. 2d 942, 949-954 (S.D. Ind. 2009), *rev'd on other grounds*, – F.3d. –, 2010 WL 4009180 (7th Cir. Oct. 12, 2010).  The Consent Decree requires the Defendant to install and operate pollution controls at both the Merom and Ratts plants that will dramatically reduce emissions of $SO_2$, $NO_x$, PM and $H_2SO_4$, thereby enhancing the environment and serving as an effective remedy to the environmental harm due to Defendant's alleged failure to meet BACT

18

emission rates.  Consent Decree §§ IV, V, VI, and VII.  The Consent Decree also requires Defendant to spend at least $5 million on environmental mitigation efforts.  Consent Decree ¶ 135 and Appendix A.  Finally, the settlement includes a civil penalty designed to deter the Defendant and other similarly situated parties from violating the Clean Air Act in the future.  *Id.* ¶ 143.

IV.     The Consent Decree is Consistent with Applicable Law and in the Public Interest

Public policy favors settlement "particularly in the area where voluntary compliance by the parties over an extended period will contribute significantly toward ultimate achievement of statutory goals."  *Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights*, 616 F.2d 1006, 1014 (7th Cir. 1980).  To evaluate the public interest, "the district court must consider whether the decree is 'consistent with the public objectives sought to be attained by Congress.'"  *Lexington-Fayette Urban County Gov't*, 591 F.3d at 490 (quoting *Williams v. Vukovich*, 720 F.2d 909, 923 (6th Cir. 1983); *see also United States v. BP Exploration & Oil Co.*, 167 F.Supp.2d 1045, 1054 (N.D. Ind. 2001) ("the most important factor as to public policy is whether the decree comports with the goals of Congress").  The Court's role "is not to determine whether the resulting array of rights and liabilities 'is the one that will *best* serve society,' but only to confirm that the resulting settlement is 'within the *reaches* of the public interest.'"  *United States v. Microsoft Corp.*, 56 F.3d 1448, 1460 (D.C. Cir. 1995) (quoting *United States v. Western Elec. Co.*, 900 F.2d 283, 309 (D.C. Cir. 1990) (emphasis in original)).

A primary purpose of the CAA is to protect and enhance the nation's air resources so as to promote the public health and welfare.  42 U.S.C. § 7401(b)(1).  Consistent with the CAA, this settlement  improves air quality and dramatically cuts harmful emissions of $NO_x$, $SO_2$ , PM

19

and $H_2SO_4$ by requiring Defendant to install and operate pollution controls at the Merom and Ratts plants and implement environmental mitigation programs.  The Consent Decree thus serves the Act's goals of reducing air pollution.  *See Wisconsin Elec.*, 522 F. Supp. 2d at 1121.

In addition to the Consent Decree being consistent with the CAA, it furthers the public interest by encouraging voluntary settlement.  An amicable settlement provides for a "speedy and reasonable remedy for the dispute."  *Aro Corp.,* 531 F.2d at 1372.  While the timeframes and other terms may differ somewhat from the relief that the United States might seek in litigation, little more would likely be gained by litigating the claims.  Litigation would have drained the time and resources of all parties involved, and could have delayed the commencement of compliance schedules. *See Akzo Coatings*, 949 F.2d at 1436 n.25.  The Consent Decree furthers the public interest by achieving a cleaner and healthier environment without the burdens and uncertainties of trial.

<u>CONCLUSION</u>

The Consent Decree substantially reduces air pollutants, requires payment of a civil penalty, secures environmental mitigation projects, and resolves a complex matter in this Court without litigation and delay.  The terms of the Consent Decree are fair, reasonable and adequate, and consistent with applicable law and the public interest.  Further, the Defendant has consented to entry of the settlement without condition.  The United States, therefore, respectfully requests that this Court sign and enter the proposed Consent Decree as a final judgment in this case.

Dated: October 19, 2010

Respectfully Submitted,

_s/ Jason A. Dunn_
Jason A. Dunn
Senior Attorney
Environmental Enforcement Section
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 7611
Washington, D.C.  20044-7611
Telephone: (202) 514-1111
Fax: (202) 616-6583
Email: Jason.Dunn@usdoj.gov

THOMAS E. KIEPER
Executive Assistant United States Attorney
Southern District of Indiana
10 West Market Street, Suite 2100
Indianapolis, IN 46204-3048

OF COUNSEL:
SABRINA ARGENTIERI
Associate Regional Counsel
Office of Regional Counsel (C-14J)
U.S. EPA, Region 5
77 W. Jackson Boulevard
Chicago, Illinois 60604-3590

ILANA SALTZBART
Attorney-Advisor
U.S. EPA
1200 Pennsylvania Ave., N.W.
Washington, DC 20460

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 19th day of October, 2010, I caused true and accurate copies of

the Motion to Enter Consent Decree and Memorandum in Support to be filed and served via the

Court's ECF system, and to be served on the defendant in this action at the address indicated

below by putting same into the United States mail, first class, postage prepaid.

John M. Holloway, III, Esq.
Elizabeth C. Williamson, Esq.
Winston and Strawn LLP
1700 K Street, N.W.
Washington, D.C. 20006-3817


*/s Jason A. Dunn*
Jason A. Dunn
Senior Attorney
Environmental Enforcement Section
United States Department of Justice
P.O. Box 7611
Washington, D.C.  20044-7611